**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JASON A. WRIGHT,
*Defendant-Appellant.*

No. 08-10525

D.C. No.
4:03-cr-01908-RCC-
CRP

OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
July 12, 2010—San Francisco, California

Filed November 4, 2010

Before: Procter Hug, Jr., and Milan D. Smith, Jr.,
Circuit Judges, and Thomas F. Hogan,
Senior District Judge.*

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Hug

---

*The Honorable Thomas F. Hogan, Senior United States District Judge
for the District of District of Columbia, sitting by designation.

18167

**COUNSEL**

Jon Sands, Federal Public Defender, Heather E. Williams and Brian I. Rademacher (on the brief and argued), Assistant Federal Public Defenders, District of Arizona, for the defendant-appellant Jason A. Wright.

Dennis K. Burke, United States Attorney, Christina M. Cabanillas, Appellate Chief, Bruce M. Ferg (on the brief and argued), Assistant U.S. Attorney, District of Arizona, for plaintiff-appellee United States of America.

---

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant Jason Wright appeals his conviction and sentence for the transportation and possession of child pornography in violation of 18 U.S.C. § 2252A(a)(1), (a)(5)(B). Wright raises numerous issues of alleged error. First, he challenges his conviction based on insufficiency of the evidence. With respect to his conviction under 18 U.S.C. § 2252A(a)(1), Wright argues that the charged offense requires interstate transmission of child pornography files, yet there is evidence that none of the files crossed state lines. With respect to both counts of which Wright was convicted, he argues that there is no evidence proving he knew that the twenty-seven files charged in the indictment were either on his computer or contained child pornography. Second, Wright challenges the district court's denial of his motion to suppress statements. Third, Wright maintains that he was denied a fair trial based on: (1) the district court's exclusion of evidence under Federal Rule of Evidence 404(b); (2) prosecutorial misconduct throughout the course of the trial; (3) Wright's limited access to a mirrored copy of the computer's hard drive; and (4) an erroneous jury instruction that failed to require the jury to find Wright knew the files charged in the indictment existed on his computer and contained child pornography. Wright also argues that even if the court would not reverse on the basis of any of these errors individually, their cumulative effect denied him a fair trial. Finally, Wright argues that his 121-month sentence was improper.

We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand to the district court for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2003, from the FBI office in Tucson, Arizona, FBI Special Agent Robin Andrews conducted an undercover search on a file-sharing program known as an mIRC[1] (Internet Relay Chat). Andrews came across the user name "azgymguy2" in the chat rooms "100%teensexpics" and "gayteenpics." After typing in a "trigger" that allowed her to establish a direct connection with azgymguy2's file-trader, the following announcement appeared:

> Welcome to my server. I'm fairly open to uploads, so please just upload stuff you feel is good. However, I am always looking for huge cocks, young boys and movies. I hope you enjoy your stay.

Andrews downloaded thirteen files—three of which were child pornography.[2] Andrews conducted a second session that afternoon, repeating the steps she took in the morning. This time she downloaded fifty-nine files, twenty-one of which were child pornography. Andrews conducted three more undercover sessions on January 27, January 29, and February 4, 2003.

---

[1]IRC networks allow users to chat and share files in real-time, yet files are not actually transferred over the network. Rather, files are transferred via direct client communications (DCC), in which two computers connect directly to each other rather than through the IRC servers.

[2]The parties dispute how many of the thirteen files contained child pornography. In its brief, the government asserts that all thirteen files depicted boys under 16 years of age engaged in sexual activities. However, Andrews testified at trial that only three of the thirteen files were child pornography.

According to the government's expert witness at trial, Sven Nielsen, Wright's direct client-to-client connection to Andrews—that is, the connection Wright used to transport the images to Andrews—did not go through IRC servers such "that the actual traffic of sending the file or sending the chat from that point on d[id] not actually cross state lines." Nielsen also explained that, in order to establish a direct client-to-client connection, the initial request takes "the normal IRC route," but once the request is accepted the computers are connected directly, not through the server. Of course, while the direct client-to-client communication does not actually cross state lines, the files are still transmitted over the Internet. *See* Appellee's Supp. Excerpts of Record (SER) at 165 ("if Joe clicks 'yes' and starts accepting the file, then my computer will send that file directly over the Internet, not going through the IRC servers"); *see also United States v. Lewis*, 554 F.3d 208, 211 (1st Cir. 2009) (explaining that while "peer-to-peer" networks, or "direct connection[s]" do not travel through "central servers," the transfers are still subject to Internet communication "associated with the underlying TCP/IP protocol" (internal quotation marks omitted)). Furthermore, Andrews testified that when she logged on to the IRC network on January 16 and eventually connected to Wright's file-server, from which Wright transported the child pornography files, she connected through a server in San Jose, California. *See* SER at 63; *see also id. at* 77 (same with respect to afternoon session on January 16); *id.* at 142 (January 27 session took place via a server in Fairfax, Virginia); *id.* at 167 ("[T]ypically the way people connect to an IRC server is they just say connect me to the undernet and just pick a server for me.").

After matching Wright's home address with "azgymy-guy2's" Internet connection, the FBI executed a search warrant at Wright's residence on February 13, 2003. Agents seized Wright's desktop computer and a laptop from the bedroom of Wright's roommate, Shawn Dittfurth. While other agents searched Wright's apartment, Andrews and Detective

Jeff Englander of the Pima County Sheriff's Office questioned Wright outside the apartment in an unmarked police vehicle.

Approximately one week after the search, Dittfurth disappeared. According to Wright, Dittfurth unexpectedly moved out of Wright's apartment. Wright's defense throughout the trial was that it was Dittfurth, and not Wright, who was responsible for possession of the child pornography found on Wright's desktop computer. Wright sought to introduce evidence at trial supporting this theory; however, as we discuss more fully below, Wright claims that the district court excluded any such evidence on the basis that Dittfurth did not testify at trial.

In the Superseding Indictment, the government charged Wright with ten counts relating to the advertisement, transportation, and possession of child pornography. Count 1 alleged that Wright knowingly published a notice and advertisement seeking or offering child pornography in violation of 18 U.S.C. § 2251(c)(1)(A).[3] The jury acquitted Wright of Count 1. The government also alleged, in Counts 4 through 10, that Wright knowingly possessed images of child pornography on separate CDs, in violation of 18 U.S.C. § 2252(a)(5)(B). Wright was also acquitted of the possession charges with respect to those images.

Counts 2 and 3 are the focus of this appeal. Based on Andrews's undercover sessions connecting to Wright's computer, the government charged Wright with transporting nine files in Count 2. The jury convicted Wright of "knowingly transport[ing] and ship[ping] in interstate commerce, by means of a computer, child pornography." Based on images recovered from Wright's computer, the government charged Wright with possession of nineteen files in Count 3. Wright

---

[3]Under the current text of the statute, Count 1 corresponds to 18 U.S.C. § 2251(d)(1)(A).

was convicted of "knowingly possess[ing] computer disks . . . that contained images and films of child pornography that had been shipped and transported in interstate or foreign commerce by means of a computer." The district court sentenced Wright to 121 months on the transportation count and 60 months on the possession count, to be served concurrently.

## DISCUSSION

Wright raises a host of issues on appeal. First, he argues that 18 U.S.C. § 2252A(a)(1), as it existed at the time of his offense, requires interstate transmission of child pornography images. Second, Wright argues that there is no evidence proving he knew that the twenty-seven files charged in the indictment were either on his computer or contained child pornography. Third, Wright challenges the district court's denial of his motion to suppress statements. Fourth, Wright claims he was denied a fair trial. Finally, he claims that his sentence was improper.

## I.  18 U.S.C. § 2252A(a)(1)'s "In Interstate Commerce" Requirement

[1] As it existed at the time of Wright's offense in 2003, 18 U.S.C. § 2252A(a)(1) punished any person who "knowingly mail[ed], or transport[ed] or ship[ped] in interstate or foreign commerce by any means, including by computer, any child pornography." Whether section 2252A(a)(1)'s "in interstate . . . commerce" language requires the government to prove that the images themselves traveled across state lines appears to be a question of first impression in this circuit. Wright's principal argument is that the statute does so require. However, both parties agree that the images in question never traveled outside Arizona when Andrews downloaded them from Wright's computer. The government counters that the statute does not require the images to cross state lines. Alternatively, it argues that while the images themselves may not have traveled across state lines, their transmission would not

have occurred except for the prior communications from the defendant's file server through the IRC network to the FBI. As a result, because those communications traveled across state lines, section 2252A(a)(1)'s jurisdictional element was satisfied.

We review de novo Wright's challenge to the sufficiency of the evidence, *United States v. Green*, 592 F.3d 1057, 1065 (9th Cir. 2010), including questions of statutory interpretation, *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008).

[2] First, the government argues that section 2252A(a)(1) does not require actual transportation of child pornography across state lines. As with any statutory interpretation, we start with "the plain meaning of the statute's text." *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). As noted, 18 U.S.C. § 2252A(a)(1) punishes any person who "knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography[.]" Our analysis turns on what Congress meant by the phrase "transports . . . in interstate . . . commerce." Under the plain language of section 2252A(a)(1), the statute requires that a person mail, transport, or ship child pornography interstate. That is to say, a plain reading of the statute seems to require at least some method of interstate travel.[4]

The government's argument that section 2252A(a)(1) does not require actual transportation across state lines relies on the Third Circuit's decision in *United States v. MacEwan*, 445 F.3d 237 (2006). *MacEwan* addressed section 2252A(a)(2)(B) (2003), which punishes "[a]ny person who . . . knowingly receives or distributes . . . any material that contains child pornography that has been mailed, or shipped or transported in

_____

[4]We do not consider here, nor does Wright challenge, the constitutionality of section 2252A(a)(1) under Congress' Commerce Clause authority. Rather, we address only whether the government introduced sufficient evidence at trial to satisfy the statute's jurisdictional element.

interstate or foreign commerce by any means, including by computer."**[5]** There, the defendant stipulated to knowingly downloading child pornography from the Internet but argued that there was no evidence indicating that the images traveled interstate. *MacEwan*, 445 F.3d at 241. The Third Circuit rejected reading the phrase "interstate commerce" synonymously with "interstate transmission." *Id.* at 243. Accordingly, it held that the statute did not explicitly require that the child pornography images had to cross state lines, only that "they must have been transported in interstate commerce by any means, including by computer." *Id.* at 244 (internal quotation marks and ellipsis omitted). The court then re-framed the issue in terms of whether Internet use, standing alone, satisfies the statute's jurisdictional hook.**[6]** *See id.* (asking "whether downloading an image of child pornography from the Internet [ ] involves the receipt of something transported in interstate commerce"). According to the *MacEwan* court, it does—a contention we address more fully below.

Two other circuits have disagreed with the Third Circuit's statutory reading—at least with respect to whether a materially identical statutory provision requires actual transportation across state lines. In *United States v. Schaefer*, 501 F.3d 1197, 1204 (2007), the Tenth Circuit rejected *MacEwan*'s approach as contrary to the plain terms of the statute. It faulted *MacEwan* for "recast[ing] the jurisdictional requirement of the child-pornography statute into one that could be satisfied by

---

**[5]**As discussed further below, Congress amended the statute in 2008, adding the phrase "using any means or facility of interstate or foreign commerce" following "mailed, or." *See* Pub. L. No. 110-358, 122 Stat. 4001 (2008). We address the amendments in Section I.B., *infra*.

**[6]**A "jurisdictional hook" is a "'provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute.' " *United States v. McCoy*, 323 F.3d 1114, 1124 (9th Cir. 2003) (quoting *United States v. Rodia*, 194 F.3d 465, 471 (3d Cir. 1999)), *overruled on other grounds by Gonzales v. Raich*, 545 U.S. 1 (2005), *as recognized in United States v. McCalla*, 545 F.3d 750, 756 (9th Cir. 2008).

use of an 'interstate facility,' " a term absent from the statute's text, which instead uses the "in commerce language." *Id.* at 1205 (some internal quotation marks omitted). According to the *Schaefer* court, Congress' use of the "in commerce language" reflected "its decision to limit federal jurisdiction and require actual movement between states to satisfy the interstate nexus." *Id.* at 1201-02 (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115-16 (2001), and explaining that when it uses the phrase "in commerce," Congress does not intend to regulate to the full extent of its authority under the Commerce Clause).

The First Circuit adopted a similar view in *United States v. Lewis*, 554 F.3d 208 (2009). There, the court rejected the government's position "that Congress intended to reach purely intrastate transmission of child pornography that used a channel or instrumentality of interstate commerce." *Id.* at 212. In doing so, it looked to the jurisdictional hooks of similarly worded criminal statutes and explained that courts have interpreted Congress' decision to criminalize transportation "in interstate or foreign commerce" of the relevant material "to require actual crossing of a state or national border." *See id.* at 213-14 (citing cases); *see also Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (holding that the "in interstate or foreign commerce" language in the federal wire-fraud statute, 18 U.S.C. § 1343, "requires that the wire communication cross state lines"); *United States v. Colavito*, 19 F.3d 69, 71-72 (2d Cir. 1994) (explaining in the context of defendant's due process challenge to 18 U.S.C. § 2252(a)(4)(B) that the statute "lists several means by which pornography may travel between states, including the transmission of visual images across telephone lines by way of computer modems").

To be sure, "Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes." *Circuit City Stores*, 532 U.S. at 115. Where Congress uses the phrases "affecting commerce" or "involving commerce," it " 'signals an intent to exercise [its] commerce power to the

full.' " *Id.* (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995)). However, the phrases "in commerce" or "engaged in commerce," "are understood to have a more limited reach." *Id.*;[7] *United States v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 279-81 (1975) (discussing the limited scope of federal jurisdiction associated with the phrase "engaged in commerce" or "in commerce" as opposed to "the broad 'affecting commerce' jurisdictional language")*; cf. United States v. Alderman*, 565 F.3d 641, 645, 647-48 (9th

---

[7]Though the Supreme Court made these pronouncements in the context of interpreting a provision of the Federal Arbitration Act, it cautioned against "[a] variable standard for interpreting common, jurisdictional phrases." *Id.* at 117. Of course, "statutory jurisdictional formulations [do not] 'necessarily have a uniform meaning whenever used by Congress,' " *id.* at 118 (quoting *United States v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 (1975)), but must be construed "with reference to the statutory context in which [they are] found and in a manner consistent with the [statute's] purpose," *id.* But, contrary to the government's assertions, in view of section 2252A's legislative history it becomes apparent that Congress settled on the "in interstate commerce" language precisely because of its limited reach. The precursors to section 2252A were 18 U.S.C. §§ 2251, 2252, and 2253, enacted as part of the Protection of Children Against Sexual Exploitation Act of 1977. *See* Pub. L. No. 95-225, 92 Stat. 7 (1978). Section 2251(a)(1) punished any person who forced a minor to engage in "any sexually explicit conduct for the purpose of producing any visual or print medium depicting such conduct, . . . if such person knows or has reason to know that such visual or print medium will be transported in interstate or foreign commerce." *Id.* In the Senate Judiciary Committee Report discussing the statute's scope, the Committee stated its

> intention that the government will have the affirmative burden of showing that the person charged knew or should have known that the materials described . . . will be transported in interstate or foreign commerce or mailed. While the Committee recognizes that the jurisdictional element is often a difficult one to prove, it nonetheless believes that this requirement is necessary to preserve the balance between the law enforcement responsibilities of federal officials on one [h]and, and their state and local counterparts, on the other.

S. Rep. No. 95-438, at 16 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 40, 53. We are cognizant of preserving that same federal-state balance in our interpretation of section 2252A(a)(1). *See also* Discussion I.B., *infra*.

Cir. 2009) (holding that an identical jurisdictional hook in the felon in possession of body armor statute ensures that the statute would not criminalize body armor produced intrastate, and citing *United States v. Polanco*, 93 F.3d 555, 563 (9th Cir. 1996), for the proposition that the same jurisdictional element in the felon in possession of a firearm statute "insures, on a case-by-case basis, that a defendant's actions implicate interstate commerce to a constitutionally adequate degree" (internal quotation marks omitted)).

As the First Circuit recognized of its own precedents, *see Lewis*, 554 F.3d at 213, we too have previously interpreted similarly-worded criminal statutes to require the actual crossing of state lines. In *United States v. Korab*, we addressed 18 U.S.C. § 875(b), in which someone is guilty of federal extortion if he "transmits in interstate commerce any communication containing any threat . . . to injure the person of another." 893 F.2d 212, 213 (9th Cir. 1989) (emphasis omitted) (ellipsis in original). We held that the statute required the government to prove that the threats themselves, in that case telephone calls, traveled across state lines. *Id.* at 214. There, all of the threatening phone calls between the defendants and the victim took place intrastate and the one telephone call that crossed state lines did not contain threats. *Id.* at 213-214. Thus, while there was evidence that defendants had made an interstate telephone call to the victim, there was no evidence indicating that the call contained threats. *Id.* at 214. "[F]ind[ing] no evidence of threatening interstate communication," we reversed the conviction. *Id.* at 215.

Similarly, in *United States v. Sutcliffe*, we held that an identical jurisdictional hook in 18 U.S.C. § 875(c) was satisfied where the "[d]efendant electronically sent threats and social security numbers to internet servers located across state lines." 505 F.3d 944, 953 (9th Cir. 2007). In that case, the government presented evidence that the defendant's website, which contained the threats, was uploaded to various servers located in multiple states. *Id.* Notably, we relied on *MacEwan*

in holding that "as both the means to engage in commerce and the method by which transactions occur, the Internet is an instrumentality and channel of interstate commerce." *Id.* at 953 (quoting *MacEwan*, 445 F.3d at 245) (alteration and internal quotation marks omitted). However, the defendant's use of the Internet did not provide a sufficient basis to satisfy the jurisdictional hook. Rather, we went on to note that the defendant's website, containing the threats, crossed state lines by way of Internet servers in three different states. *Id.*

The government's reliance on *Nader*, 542 F.3d 713, is misplaced. *Nader* addressed "whether telephone calls within a single state—intrastate rather than interstate calls—can violate the Travel Act," 18 U.S.C. § 1952(a), which prohibits the use of "any *facility* in interstate or foreign commerce" with intent to further certain unlawful activity. *Id.* at 716 (emphasis added). In holding that intrastate telephone calls sufficed to meet the jurisdictional hook, we explained that the phrase "in interstate or foreign commerce" modified the noun "facility" rather than the verb "uses." *Id.* at 717-18. Therefore, it was sufficient that the defendant's illegal conduct involved a "*facility* in interstate commerce"; it was not necessary for that facility itself to be "used" in interstate commerce. *Id.* at 718. Because the telephone was a facility of interstate commerce, defendant's use of the telephone in committing the offense satisfied the jurisdictional nexus. *Id.* at 719.

**[3]** By contrast, section 2252A(a)(1) does not include the word "facility." Thus, the phrase "in interstate or foreign commerce" modifies the actus reus proscribed in the statute—mailing, transporting or shipping child pornography. Unlike the Travel Act, section 2252A(a)(1)'s jurisdictional element is focused not on the *means* the defendant uses to mail, transport, or ship child pornography, and *its* connection to interstate commerce. Rather, it requires that the defendant mail, transport, or ship child pornography interstate.

**[4]** Thus, our precedent indicates that criminal statutes punishing the transmission of the relevant material "in interstate or foreign commerce" require the material itself to cross state lines. Yet here, as the government concedes, none of the images Wright transported to Andrews's computer left the state of Arizona. Indeed, none traveled outside the city of Tucson.[8]

**[5]** To the extent the government also argues that use of the Internet, standing alone, satisfies section 2252A(a)(1)'s jurisdictional requirement, we reject that contention on these facts. What distinguishes this case from those cases holding that Internet use, standing alone, provides the sufficient jurisdictional nexus, is that in each of those cases it was impossi-

---

[8]That we hold section 2252A(a)(1) requires the defendant to transport images across state lines should come as no surprise to the government, which took the same position before the jury. In closing argument, the prosecutor told the jury:

> With regard to Count 2, if you're getting hung up on the files being transferred with that direct client-to-client connection, and that that client-to-client connection is not crossing state lines, don't spend a lot of time on it. Find him not guilty. And then go to the next charge, attempted distribution [the lesser included charge].

Indeed, following the government's request, the district court instructed the jury that to find Wright guilty of Count 2, it first had to find "that the defendant knowingly transported and shipped a visual depiction in interstate or foreign commerce." The court defined the term "interstate or foreign commerce" as meaning "the movement of property from one state to another state or from one state to another country." Finally, the jury was told that "[t]o transport or ship simply means to send or carry something from one place to another. . . . The transportation must, however, involve the movement of the materials in question either interstate, *that is, across state lines*, or internationally, that is, from one country to another." "[W]e cannot affirm a criminal conviction on the basis of a theory not presented to the jury." *Chiarella v. United States*, 445 U.S. 222, 236 (1980). Not only was the jury not told that the statute's jurisdictional element could be satisfied by the purely intrastate transmission of files, it was told the exact opposite. We reject the government's invitation to engage in revisionist history.

ble to determine whether the images in question actually crossed state lines. *See MacEwan*, 445 F.3d at 241-42; *Lewis*, 554 F.3d at 210-11 ("[I]t is impossible to say with any certainty that a given packet [a message or file to be transmitted that is broken into smaller pieces] will take the shortest route in distance; the routers search for the shortest route in time."). In the face of that uncertainty, those courts held that proof of Internet use was sufficient, reasoning that because it was just as likely that use of the Internet either remained entirely intrastate or involved multiple states, "the very interstate nature of the Internet" favored finding that the images traveled in interstate commerce. *MacEwan*, 445 F.3d at 244; *Lewis*, 554 F.3d at 215. Thus, both *MacEwan* and *Lewis* stand for the proposition that, where it is impossible to determine whether the receipt of child pornography images crossed state lines, a defendant's use of the Internet may serve as a proxy for satisfying the interstate commerce requirement.

**[6]** However, the question that both *MacEwan* and *Lewis* left unanswered is that presented by Wright's case: whether use of the Internet, standing alone, is sufficient to satisfy the "interstate commerce" requirement where it is undisputed that the images themselves did *not* cross state lines. In light of our conclusion that the statute *does* so require, we hold that a defendant's mere connection to the Internet does not satisfy the jurisdictional requirement where there is undisputed evidence that the files in question never crossed state lines.

Perhaps recognizing this dilemma, the government offers two additional arguments. First, following the Third Circuit's approach in *MacEwan*, the government re-frames the issue. The proper question, according to the government, is "whether setting up a file server to transmit child pornography through the internet by use of IRC involved transporting something in interstate commerce." Second, the government argues that in 2008 Congress amended the statute, clarifying that it always considered the "in interstate commerce"

requirement to reach images transmitted via the Internet. We address each of these arguments in turn.

## A.   Interstate Predicate Act

The government argues that while the images themselves may not have traveled across state lines, their transmission would not have occurred except for the prior communications from the defendant's file server through the IRC network to the FBI. It is undisputed that this initial connection occurred across state lines. The government contends that it would be nonsensical to protect " 'necessary intermediate steps' in pornography trafficking—such as the defendant's intrastate DCC image transmissions that only occurred because of prior interstate communications." Thus, according to the government, an interstate predicate act satisfies section 2252A(a)(1)'s jurisdictional element.

The government initially relies on our decision in *United States v. Mohrbacher*, 182 F.3d 1041, 1047 (9th Cir. 1999), which addressed "whether downloading images from a computer bulletin board constitutes shipping or transporting within the meaning of the terms as used in 18 U.S.C. § 2252(a)(1)." There, the defendant downloaded child pornography from a computer bulletin board in Denmark. *Id.* at 1043-44. After being convicted of transporting sexually explicit material in violation of 18 U.S.C. § 2252(a)(1), the defendant argued that he was convicted under the wrong section of the statute. *Id.* at 1043. We agreed, explaining that downloading is more akin to receiving materials than to transporting or shipping them. *Id.* at 1050. The government points to one isolated statement in *Mohrbacher*, where we said: "Those who are responsible for providing the images to a customer, by making them available on a computer bulletin board or by sending them via electronic mail, are properly charged with and convicted of shipping or transporting images under § 2252(a)(1)." *Id.* (emphasis omitted).

Nothing in *Mohrbacher* is apposite to the jurisdictional question presented here. Indeed, nowhere in *Mohrbacher* did we even mention the jurisdictional "in interstate commerce" requirement. Rather, the language on which the government relies meant to distinguish conduct constituting shipping or transporting images, within the meaning of the statute, from receiving or possessing them under a different subsection. *Mohrbacher* is irrelevant for purposes of this case.

Somewhat more on point is *United States v. Smith*, 795 F.2d 841, 846-47 (9th Cir. 1986). There, the defendant mailed undeveloped, unprocessed film containing images of nude teenage girls to an out-of-state developer. *Id.* at 844. He argued that the unprocessed, undeveloped film did not constitute "knowingly . . . mail[ing] any *visual depiction* . . . of a minor engaging in sexually explicit conduct." *Id.* at 845 (quoting 18 U.S.C. 2252(a)(1)(A) (emphasis added)).[9] We rejected Smith's argument, holding "that the exclusion of unprocessed film from the statute's coverage would impede the child pornography laws by protecting a *necessary intermediate step* in the sexual exploitation of children," because the fact that the film was undeveloped eliminated neither harm to the victims nor the incentive to produce the images. *Id.* at 846-47 (emphasis added); *see also United States v. Kelner*, 534 F.2d 1020, 1024 (2d Cir. 1976) ("[W]e do not feel that Congress is powerless to regulate matters in commerce when the interstate features of the activity represent a relatively small, or in a sense unimportant, portion of the overall criminal scheme. Our problem is not whether the nexus of the activity is 'local' or 'interstate'; rather, . . . so long as the crime involves a necessary interstate element, the statute must be treated as valid." (internal citations omitted)).

We reject the government's view that Wright's entirely intrastate acts satisfy the statute's interstate commerce

---

[9]The statute at issue in *Smith* had the same jurisdictional hook as section 2252A(a)(1), though there was no jurisdictional issue in that case.

requirement solely because of prior interstate activity. First, to the extent that *Smith* can be read to suggest that Wright's *connection* to the IRC network provides an adequate basis for federal jurisdiction, this would ignore the text of section 2252A(a)(1). The statute requires that the defendant "*transport* . . . in interstate commerce . . . any child pornography." The transportation of images is the focus, rather than the connection to a network in interstate commerce that contains child pornography. It was through Wright's *connection* to the interstate network that he allegedly advertised his willingness to exchange child pornography, though he did not transport any images through those channels.

To accept the government's argument would be to sustain Wright's Count 2 conviction based on conduct of which Wright was acquitted in Count 1. Count 1 alleged that in violation of 18 U.S.C. §§ 2251(c)(1)(A), (c)(2)(A), (d), Wright

> did knowingly make, print and publish a notice and advertisement seeking and offering to receive, exchange, display, distribute and reproduce visual depictions involving the use of minors engaging in sexually explicit conduct, knowing or having reason to know that such notice and advertisement will be transported in interstate or foreign commerce by means of computer.

Thus, section 2251(c) punishes a person who advertises the exchange of child pornography if "such person knows or has reason to know that such . . . advertisement will be transported in interstate . . . commerce." 18 U.S.C. § 2251(c)(2)(A) (2003) (emphasis added). Section 2252A(a)(1), on the other hand, requires that the defendant know he is transporting the actual images across state lines. *See also Korab*, 893 F.2d at 214-15 (rejecting the government's argument that conduct in connection with the crime of which the defendant was acquitted could be used to satisfy jurisdiction). Therefore, holding that section 2252A(a)(1) can be satisfied by predicate Internet

use, e.g. advertising, would conflate it with section 2251(c), of which Wright was acquitted.

Second, sustaining Wright's conviction based on interstate conduct outside the actual scope of section 2252A(a)(1) would be contrary to *Korab* and *Sutcliffe*, where we held that the act being criminalized in the statute at issue must itself travel across state lines. Indeed, *Korab* rejected a nearly identical argument to that now advanced by the government. In *Korab*, the government argued that a January 11 interstate telephone call placed by the defendants to the victim satisfied the interstate communication requirement. 893 F.2d at 214. The call concerned logistical details pertaining to the defendants' extortionate scheme, including defendants' specific instructions to the victim on making the payment. *Id.* We held such conduct insufficient to maintain a conviction; the interstate call was not an essential element of the crime since it did not contain any threats. *Id.* Thus, *Korab* rejected holding that a defendant's interstate predicate act, though perhaps necessary to completing the offense, provides a sufficient basis for jurisdiction where that act was not an essential element of the crime of conviction. *See also id.* (holding that interstate communications involving threatening phone calls made after the charge set forth in the indictment were not part of the crime of conviction, and therefore could not form the basis for jurisdiction).

The government provides a third reason why we should consider Wright's prior interstate activity as a basis for jurisdiction. It argues to hold otherwise would ignore that the statute includes the transportation of child pornography "by computer." We disagree.

Congress added the phrase "by any means including by computer" following "interstate or foreign commerce" in 1988, to section 2252A's predecessors, 18 U.S.C. §§ 2251(c)(2) and 2252(a). Pub. L. No. 100-690, § 7511, 102 Stat. 4181 (1988). To be sure, adding the phrase "*including* by

computer" signals Congress' intent to call particular attention to computers as a "means" of interstate commerce—that is, a means by which child pornography may be transported interstate. *See* Webster's Third New International Dictionary 1143 (2002) (listing among the uses of the word "include" to "call more attention to the single item or smaller class by stressing the fact of its existence or the fact of its not having been overlooked"). But that Congress listed computers as one particular means of interstate transport does not permit treating computer transport somehow differently from all other means of interstate travel. *See Lewis*, 554 F.3d at 214 ("The plain language of the statute indicates that we are to treat shipment or transmission by computer the same way we would shipment or transmission by any other means."); *Schaefer*, 501 F.3d at 1202 ("The phrase 'including by computer' specifies a method of interstate movement; the government must still establish that any computer-related movement crossed state lines."). Whether the defendant transported child pornography by mail, by sea, or by computer, the government must still prove it crossed state lines.

**[7]** Accordingly, we hold that an interstate predicate act—here, Wright's connection to the IRC network—does not provide a sufficient basis for federal jurisdiction under section 2252A(a)(1).

## B.  2008 Amendments

Next, the government argues that the Effective Child Pornography Prosecution Act of 2007 (the 2007 Act), enacted October 8, 2008, *see* Pub. L. No. 110-358, 122 Stat. 4001, clarified Congress' intent that section 2252A(a)(1)'s jurisdictional hook was always meant to encompass the transmission of child pornography over the Internet, regardless of whether the files crossed state lines. The parties disagree as to whether the 2007 Act "clarified" versus "significantly expanded" section 2252A(a)(1)'s reach. *See Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265 (9th Cir. 1997) (addressing

whether a subsequent enactment applied to a pending case by determining whether the statute clarified or "substantial[ly] change[d]" the law). We therefore discuss the relevant legislative history in some detail.

In 1978, Congress enacted the Protection of Children Against Sexual Exploitation Act of 1977 (the 1977 Act), adding sections 2251, 2252, and 2253 to Title 18 of the United States Code. Pub. L. No. 95-225, 92 Stat. 7 (1978). In passing the 1977 Act, Congress was concerned with the connection between child pornography and child prostitution, finding that children being used both as prostitutes and as the subjects of pornographic materials had become a nationwide, multimillion dollar industry that harmed children and society as a whole. S. Rep. No. 95-438, at 5-8, *reprinted in* 1978 U.S.C.C.A.N. 40, 42-45. As proposed, section 2252 stated:

> Any individual who knowingly transports, ships, or mails through or in such a manner as to *affect* interstate or foreign commerce any photograph or film depicting a child engaging in a prohibited sexual act or in the simulation of such an act, or any individual who receives for the purpose of selling or sells any such photograph or film which has been transported, shipped, or mailed through or in such a manner as to *affect* interstate or foreign commerce shall be fined not more than $25,000 or less than $5,000 or imprisoned not more than fifteen years or less than two years or both.

*Id.* at 60 (emphases added). Section 2251, which prohibited the actual use of minors to engage in sexually explicit conduct, also contained the "affect commerce" language. *See id.* In response to the proposed bill, Assistant Attorney General Patricia M. Wald, writing on behalf of the Department of Justice, recommended that the words "affect interstate commerce or foreign commerce" be deleted. *Id.* at 61. While the Justice Department recognized that Congress could constitutionally

proscribe such activity under its Commerce Clause power, it was concerned that the proposed language would cover purely intrastate distribution, based

> on the theory that commerce is 'affected' in that the processing of the film or photographs utilize materials that moved in interstate commerce. In our opinion, the investigation or prosecution of purely local acts of child abuse should be left to local authorities with federal involvement confined to those instances in which the mails or facilities of interstate commerce are actually used or intended to be used for distribution of the film or photographs in question.

*Id.* (internal citations omitted). In response, Congress replaced the more broadly reaching phrase "affect interstate or foreign commerce," with the more limited "in interstate or foreign commerce." In doing so, Congress recognized that the jurisdictional element was an important component of preserving the balance between federal and state law enforcement responsibilities. *See id.* at 53-54; *see also* n.6 *supra*.

In 1996, Congress enacted the Child Pornography Prevention Act (the 1996 Act), adding section 2252A to the statutory framework. Section 2252A(a)(1), the provision under which Wright was convicted that punishes the transportation of child pornography, included the same jurisdictional "in interstate or foreign commerce" element as the earlier enacted section 2252(a)(1). *Compare* Pub. L. No. 104-208, 110 Stat. 3009, 3009-28 (1996), *with* Pub. L. No. 95-225, 92 Stat. 7 (1978).

While the 1996 Act left unchanged the jurisdictional hook from section 2252(a)(1), two years after passage of the 1996 Act, the 1998 Congress added a new jurisdictional basis to section 2251, which prohibits the production of child pornography. *See* Pub. L. No. 105-314, 112 Stat. 2974, 2977 (1998). Before 1998, section 2251 punished any person involved in the production of child pornography where such person knew

or had reason to know that the pornography would be transported in interstate or foreign commerce, or if the pornography was actually so transported. *See* 18 U.S.C. § 2251 (1996). The 1998 Act expanded the jurisdictional reach of section 2251 to include situations in which the pornography "was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce." 18 U.S.C. § 2251 (1998). In so amending section 2251, Congress brought the child pornography production statute in line with analogous possession statutes, which already prohibited the possession of child pornography produced using such interstate materials. *See* 18 U.S.C. §§ 2252(a)(4)(B), 2252A(a)(4)(B), 2252A(a)(5)(B). Congress recognized that, as previously enacted, the production statute did not account for those cases where the visual depictions had not actually crossed state lines, or where there was no proof of the producer's knowledge that they would be so transported, and remedied its concerns by expanding the statute's reach. *See* H.R. Rep. 105-557, at 26-27 (1998), *reprinted in* 1998 U.S.C.C.A.N. 678, 695.

Thus, the 1996 Act is significant in several respects. First, in leaving unchanged the jurisdictional language of section 2252(a)(1), Congress again rejected the broader jurisdictional reach encompassed by the "affecting commerce" language. In doing so, Congress reinforced its earlier concerns with respect to maintaining the balance between federal and state law enforcement of transporting child pornography. Second, Congress chose not to bring the jurisdictional reach of the transportation offense in line with the possession offenses, as it did in 1998 with the child pornography production statute. In other words, Congress did not amend section 2252A(a)(1) to prohibit transporting any child pornography "that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce."

**[8]** In 2008, Congress passed the 2007 Act. Based in part on a finding in the 2007 Act that "[t]he transmission of child

pornography using the Internet constitutes transportation in interstate commerce," Pub. L. No. 110-358, § 102(7), Congress amended the jurisdictional provisions in sections 2251, 2252, and 2252A in a section titled "Clarifying ban on child pornography." Pub. L. No. 110-358, § 103. Most relevant here, in section 2252A(a)(1) Congress inserted the phrase "using any means or facility of interstate or foreign commerce or" after "ships," and replaced "in interstate" with "in or affecting interstate commerce." 122 Stat. 4001, 4002-03. Thus, following the 2007 Act, section 2252A(a)(1) punishes "[a]ny person who knowingly mails, or transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography."

The government argues that the 2007 Act confirms that Congress always meant for section 2252A(a)(1)'s jurisdictional element to be satisfied by any predicate use of the Internet, and that we should so construe the statute as enacted in 1996. We disagree. First, in enacting section 2252A(a)(1) in 1996, Congress made no relevant change to the jurisdictional hook inserted in the 1977 Act. The legislative history makes clear that Congress settled on the "in interstate commerce" language because of its limited scope and squarely rejected an earlier proposed bill that would have reached conduct "affecting interstate commerce." By contrast, in 2007 Congress chose to regulate to the outer limits of its Commerce Clause authority by inserting the "affecting interstate commerce" language. *See* 153 Cong. Rec. H13591-92 (daily ed. Nov. 13, 2007) (statement of Rep. Conyers) (stating Congress' intent "that the prohibitions against child pornography reach the full extent of its constitutional authority"); *id.* at H13592 (statement of Rep. Goodlatte) ("The proposed legislative fix . . . would expand the jurisdiction to prosecute these crimes when the Internet is used. This is the broadest assertion of interstate commerce power that the Congress can make consistent with the Constitution."); *see also Circuit City Stores*, 532 U.S. at 115. In light of Congress' earlier efforts to afford the statute

a more limited jurisdictional reach, we consider the 2007 Act to have effected a substantial change in section 2252A(a)(1), rather than a clarification. *See Beverly*, 132 F.3d at 1265. Though Congress labeled the 2007 Act a mere clarification, to so construe it that way would ignore both as a matter of law, *see Circuit City Stores*, 532 U.S. at 115, and as a matter of fact, Congress' deliberate use of jurisdictional modifiers, *see Beverly*, 132 F.3d at 1266 n.6 (Congress may formally declare that an act clarifies the law so long as doing so would not run contrary to the statute's actual text).

Second, while Congress chose to reach some wholly intra-state conduct with respect to distribution and possession of child pornography, it made no similar decision with respect to transportation. Indeed, as stated above, it explicitly rejected language that would have reached such conduct.

**[9]** Finally, other courts have recognized that despite the 2007 Act, they are bound by the statute as written at the time of the offense. *See Lewis*, 554 F.3d at 216 (interpreting the pre-amendment version of section 2252A and characterizing the 2007 Act as "expand[ing] the jurisdictional coverage"); *United States v. Swenson*, 335 F. App'x 751, 753 (10th Cir. 2009) (applying *Schaefer* and stating that "the government concedes, as it must, that this case is governed by the pre-amendment statute").

**[10]** In sum, we hold that at the time of Wright's offense, section 2252A(a)(1) required the government to prove that the child pornography images actually crossed state lines. Since it is undisputed that none of the images that form the basis of Count 2 crossed state lines, there is insufficient evidence that Wright "transport[ed] . . . in interstate . . . commerce by any means, including by computer, any child pornography." Accordingly, we reverse his Count 2 conviction.

## II. Wright's Knowledge

Next, Wright challenges the sufficiency of the evidence as to both Counts 2 and 3 on the basis that he did not know that

the specific files charged in each count were on his computer and contained child pornography. The government counters that Wright admitted such guilty knowledge to Agent Andrews and Detective Englander and his convictions should be sustained by virtue of this confession along with sufficient corroborating evidence.

   **[11]** Where the government relies on a defendant's confession to meet its burden of proof, it must introduce two types of corroborating evidence: (1) "sufficient evidence to establish that the criminal conduct at the core of the offense has occurred"; and (2) "independent evidence tending to establish the trustworthiness of the admissions." *United States v. Lopez-Alvarez*, 970 F.2d 583, 592 (9th Cir. 1992). Wright principally challenges this second requirement, arguing that his statements should never have been introduced because they were not voluntary. Therefore, since Wright's knowledge with respect to Counts 2 and 3 turns on whether his admissions were properly admitted, we must examine whether the district court erred in denying Wright's motion to suppress his statements.

   The district court held a suppression hearing, at which Agent Andrews, Detective Englander, and Wright all testified. A number of factual disputes were revealed by their testimony. For example, Agent Andrews testified that when the FBI first entered Wright's apartment, they placed both Wright and his roommate Dittfurth in handcuffs in order to conduct a sweep of the premises. However, at the conclusion of the initial sweep, Andrews testified that Wright's handcuffs were removed. Andrews stated that she then asked Wright if he would like to go downstairs from the apartment and answer some questions in Englander's car parked out front. Wright agreed to answer their questions; he testified that he felt he had no choice. According to Andrews, Wright was no longer in handcuffs when he accompanied the officers to Englander's car. Detective Englander also testified that he did not recall Wright being handcuffed on the way to the car and stated that

Wright was not handcuffed during questioning. However, Wright testified that he was initially handcuffed and thrown on the floor of his apartment for approximately fifteen minutes, and that he remained in handcuffs while being taken to Detective Englander's car and for the majority of questioning inside the car.

There was also a dispute as to whether Wright was read his *Miranda* rights before questioning. Agent Andrews and Detective Englander both testified that Englander read Wright his *Miranda* rights and that Wright waived those rights. However, Wright testified that he was never read his rights.

Next, Wright testified that he asked on three separate occasions to speak to an attorney. Specifically, Wright stated that he asked the officers if he could get his cell phone in order to call an attorney friend. But according to Wright, he was told that he could not return to the apartment to retrieve his phone and that there was no need for him to speak with a lawyer. Both Andrews and Englander testified that Wright never requested to speak to a lawyer. Andrews, Englander, and Wright all seem to agree that the questioning lasted between forty-five minutes and an hour.

Neither Andrews nor Englander tape-recorded the conversation they had with Wright. Wright argued in the district court that their failure to do so violated Wright's due process rights.

The district court denied Wright's motion to suppress in a two-line Order:

> After hearing evidence and reviewing the memorandum filed by counsel, the Court will **DENY** the Motion to Suppress Statements (#55).
>
> While the Court believes it would have been better if all these statements were taped, the law does not require it, the Court also cannot.

**[12]** The absence of any factual findings by the district court considerably frustrates our appellate review. Relying on *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), Wright argues that he was in custody at the time of police questioning and was therefore entitled to *Miranda* warnings, which he did not receive. While determining whether a defendant is constitutionally entitled to *Miranda* warnings is subject to de novo review, it is nevertheless a fact-intensive inquiry. *Id.* at 1082, 1084; *see also United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (whether a person is "in custody" for *Miranda* purposes is a mixed question of law and fact; factual findings are reviewed for clear error). "[A] suspect is . . . considered 'in custody' for purposes of *Miranda* if the suspect has been 'deprived of his freedom of action in any significant way.' " *Craighead*, 539 F.3d at 1082 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Yet there are several threshold factual disputes important to determining whether Wright would have felt free to leave. For example, Wright testified that he remained in handcuffs the entire time he was being questioned, a period that lasted between forty-five minutes and an hour. *See United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981) (holding that while "[h]andcuffing a suspect does not necessarily dictate a finding of custody[,]" it is a factor the district court should consider). He also testified that he requested on three different occasions to call a friend who was an attorney, but was told that he could not return to his apartment where his phone was located. This is in stark contrast to the officers' testimony, in which both Andrews and Englander stated that Wright never mentioned wanting to speak to a lawyer, but that had he so requested, they would have immediately stopped the interview. *See Craighead*, 539 F.3d at 1084 (listing among the factors to consider whether an in-home interrogation was custodial "whether the suspect was at any point restrained" and "whether the suspect was informed that he was free to leave or terminate the interview"). It is also significant that whether or not Wright was told he was free to leave, he could not simply return to his home, since it was being searched.

*See id.* at 1088 (concluding that despite being told he was free to leave, the defendant would not have reasonably believed he was free to go because agents were searching his home); *United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir. 1982) (per curiam) (holding defendant would not have felt free to leave where he "was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house"). The district court must resolve these factual disputes in order for this court to address whether Wright was in custody for purposes of *Miranda*, and thus should have received adequate *Miranda* warnings.

Nor can we resolve the issue by simply assuming that Wright was entitled to *Miranda* warnings, received them, and subsequently effected a valid waiver. The district court made no finding as to whether Wright invoked his right to counsel on the three separate occasions he requested calling his friend. At a minimum, Wright's statements should have led the officers to clarify Wright's intention. *See United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992). Instead, Wright testified that he was told not to worry, that he was not being arrested, and that he could not return to his apartment to get his phone.

The absence of factual findings also impedes our review of Wright's claims that his statements were not made voluntarily. "In determining the voluntariness of a confession, we 'examine[ ] whether a defendant's will was overborne by the circumstances surrounding the giving of a confession.' " *Doody v. Schiro*, 596 F.3d 620, 638 (9th Cir. 2010) (en banc) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Voluntariness is determined by considering the totality of the circumstances, including "*close scrutiny* of the facts." *Id.* Under Federal Rule of Criminal Procedure Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." We have held that compliance with that rule (formerly Rule 12(e)) is "particularly important in a case . . .

where we examine all the surrounding circumstances." *United States v. Castrillon*, 716 F.2d 1279, 1282 (9th Cir. 1983) (internal quotation marks omitted). As a result, "we require a statement on the record of those factual findings upon which the district court based its grant of the motion to suppress." *Id.* at 1283 (remanding the question of voluntariness in the absence of adequate factual findings).

The government maintains that a remand is unnecessary in this case because the district court's factual findings are implicit in its ruling. It argues that the suppression hearing boiled down to a credibility contest, in which case the district court "unmistakably found the defendant's testimony unbelievable, adequately finding the 'essential' facts required by Rule 12(d)." However, the cases on which the government relies are inapposite. For example, *in United States v. Whitworth*, 856 F.2d 1268, 1278 (9th Cir. 1988), we held that while the district court did not specifically address the defendant's request for counsel, implicit in the district court's ruling was that the court believed the agent's testimony that it was the defendant who initiated a conversation with the officers following his initial request for counsel. However, in *Whitworth*, the district court clearly articulated two grounds for denying the defendant's suppression motion and provided factual findings upon which it based its ruling. Indeed, the court credited the agents' testimony in finding both that the defendant received *Miranda* warnings and that his statements were made voluntarily. *Id.* We held that those findings were not clearly erroneous. *Id.*

Here, the district court made no factual findings and the only theory identified in its order denying the suppression motion is that the officers were not required to record their conversation with Wright. But Wright raised a number of grounds in his motion to suppress, which required important factual disputes to be resolved. The district court gave no indication that it believed all of Agent Andrews's and Detective Englander's testimony and found Wright's testimony

entirely incredible. Rather, the district court seems to have avoided making any credibility determination, choosing instead to deny Wright's suppression motion on the basis that the government was not required to record the interview.

In *United States v. Prieto-Villa*, 910 F.2d 601, 606 (9th Cir. 1990), we held that remand for factual findings is required where it is impossible to determine the basis for the district court's denial of a motion to suppress. *See also id.* at 610 (holding that absent a revision to Rule 12(d), "district courts must put their essential factual findings on the record"). We recognized that earlier cases, which held that the appellate court would "affirm in the absence of factual findings if any reasonable view of the evidence would sustain the denial of the motion," had overlooked the requirements of Rule 12(d). *Id.* at 607 (internal quotation marks omitted). *Prieto-Villa* also recognized that factual findings are particularly important in the context of suppression hearings. *Id.* at 609-10.

**[13]** Therefore, we reverse the denial of Wright's motion to suppress and remand with instructions to the district court to make essential factual findings explaining the basis for its decision.[10]

_____

[10]Wright argues that the district court should consider the failure to record the interview in deciding the admissibility of Wright's statements. In *United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977) (per curiam), we declined to adopt a rule mandating the electronic recording of post-arrest statements. Of course, the district court may support any disbelief it has of any witness' testimony by noting the lack of a recording. *Cf. United States v. Martinez*, 514 F.2d 334, 341 (9th Cir. 1975) (explaining that "in certain restricted circumstances" a witness' story might be so implausible that "disbelief of testimony can *support* the truth of what the witness denies," but "there must also be other objective evidence on the record which buttresses the fact finder's drawing of the opposite inference" (emphasis added) (some internal quotation marks omitted)); *accord United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) ("[While] there is no constitutional requirement that confessions be recorded by any particular means, . . . the failure by the FBI to use equipment at its disposal

### III.  Wright's Fair Trial Claims

#### A.  Exclusion of 404(b) Evidence

**[14]** Next, Wright argues that the district court erred in precluding evidence that Wright's roommate, Shawn Dittfurth, had motive, opportunity, knowledge, and the ability to obtain, view, and possess child pornography. Wright wanted to introduce evidence showing that Dittfurth had a sexual attraction to minor boys and was proficient with computers. Wright claims that the district court precluded this "prior act" evidence under Federal Rule of Evidence 404(b) because Dittfurth did not testify. The government raises two arguments in response. First, the government claims that Wright never actually offered any such evidence and therefore the district court did not preclude it. Second, the government argues that, assuming the district court did exclude the evidence, it was proper to do so, though on alternative grounds.

On January 27, 2006, Wright filed a Notice of Intent To Present Other Act Evidence under Rule 404(b). Wright sought to introduce four different pieces of evidence with respect to prior acts of his roommate, Dittfurth. First, Wright intended to introduce records from Mount Saint Mary College in Newburgh, New York, showing Dittfurth received a computer competency waiver from Saint Mary's, as well as an "A" in Computer Literacy. Wright's theory for admission was that Dittfurth's computer competency would show Dittfurth had the knowledge necessary to commit the charges. He intended to call a custodian of records from Saint Mary's to testify. Second, Wright intended to introduce, through Wright's testi-

---

might support a larger inference that the agents' testimony did not accurately portray the circumstances surrounding Yunis' confession."). However, since the district court must consider the totality of the circumstances, it may also consider that the FBI has adopted a policy of not recording interviews.

mony at trial, that Dittfurth lived with Wright during the relevant time period and that Dittfurth was often alone in the apartment, where he had access to Wright's desktop computer. According to Wright, such testimony would show that Dittfurth had the opportunity to commit the alleged offenses. Third, also through Wright's testimony, Wright intended to introduce evidence that after Wright's apartment was searched on February 13, 2003, Dittfurth encouraged Wright to sign over to Dittfurth power of attorney to Wright's property and businesses, and suggested that Wright flee the country before charges were filed against him. Wright theorized that this evidence would show Dittfurth had the motive, intent, plan, and preparation to commit the offenses. Finally, Wright would testify that Dittfurth visited the site gay.com, where his online identity was "Presumed Innocent." Wright argued that this evidence would show Dittfurth's identity and knowledge and that Dittfurth's "on-line identity is ironic in light of this case."

Argument on Wright's motion took place nearly a year later, on January 22, 2007. Wright's counsel indicated that the government agreed to allow Wright to testify that Dittfurth lived with Wright during the relevant time period. However, the government contested the other three pieces of evidence, which defense counsel proceeded to address in her argument to the district court. As to each piece of evidence Wright sought to introduce, the district court asked defense counsel how the evidence was relevant should Dittfurth not testify at trial. *See* District Ct. Docket No. 374: Transcript of Motion Hearing dated Jan. 22, 2007 at 14 (concerning Dittfurth's computer literacy); *id.* at 17 (power of attorney); *id.* at 19 (Presumed Innocent screen name). Likewise, the government assumed that the only way in which any of the evidence could be introduced was if Dittfurth testified. At the close of argument, the district court indicated that it agreed that evidence about Dittfurth's computer knowledge and the statements Dittfurth allegedly made requesting Wright give Dittfurth

power of attorney were both relevant; not so with respect to the Presumed Innocent screen name.

The minute entry from the January 22 hearing contains the following entry: "Further 404B on Shawn Dittfurth; *if he testifies*, the Court finds evidence regarding testing out of computer class, and his statement to have defendant Wright turn over power of attorney to property in Mexico relevant; his use of on-line screen name of 'presumed innocent' is not relevant." Appellant's Excerpts of Record (ER) at 35 (emphasis added). In later hearings with the court, defense counsel also discussed the possibility of calling Dittfurth's co-worker, Holly White, to testify to his credibility (since law enforcement interviewed him when they searched Wright's apartment) and to establish Dittfurth's interest in teenage boys. White would testify that when she worked at a skate shop with Dittfurth, he made passes at boys around the ages of 12-15. Defense counsel also discussed calling Nick Shorb, a 12-13 year old boy who worked with Dittfurth at the skate shop who would testify that Dittfurth made passes at him and showed him pornography. Both White and Shorb later appeared on Wright's list of witnesses for trial.

There was no further discussion of whether the 404(b) evidence would be coming in until the first day of trial on January 17, 2008. During her opening statement, defense counsel discussed Dittfurth at some length, including references to his knowledge of computers from his days at Saint Mary's College, and that he encouraged Wright to go to Mexico following execution of the search warrant. After the court recessed the jury for the day, the government objected to defense counsel referring to individuals who would be testifying about Dittfurth, arguing that none of that evidence should come in unless Dittfurth testified. The government pointed out that neither it nor the defense would be calling Dittfurth to testify.

The district court initially expressed its skepticism as to whether the evidence could be admitted absent Dittfurth testi-

fying. However, the court never explicitly precluded such evidence. Rather, the district court left it to defense counsel to provide the court with a legal basis for introducing the evidence. Indeed, the district court judge stated numerous times that he was not sure if the evidence could come in without Dittfurth's testifying, but that it was up to defense counsel to convince him otherwise. *See* ER at 52 (responding to the prosecutor's statement that the evidence was not relevant without Dittfurth testifying, saying: "I haven't crossed that road yet, either, so I'm sure Ms. Williams is going to provide some sort of legal basis to allow that to come in without Mr. Dittfurth."); *id.* ("I'm having trouble seeing that, I don't see how they're relevant without [Dittfurth], but I'm sure Ms. Williams will show me some book if it says they are."); *id.* at 53 ("I'll still [sic] having trouble seeing how they come in without having Mr. Dittfurth called as a witness in some fashion. Not in some fashion, being called as a witness. I don't know see how I can cross that bridge, Ms. Williams, but we'll see."). The court then recessed for the day.

The trial continued the following day. At the conclusion of the day's proceedings, after the court recessed the jury, defense counsel "apologize[d] to the Court." She told the court that she went back and checked the minute entry from the earlier January 22 hearing and realized that "[t]he Court had permitted me to get into the St. Mary's records as well as the power of attorney and going to Mexico if Mr. Dittfurth testified, and, as I explained yesterday, I was under the impression until yesterday morning that Mr. Dittfurth was going to testify."[11] Defense counsel also told the court that she realized that she would also be precluded from calling Holly White and requested that White be released from her subpoena. The district court then asked defense counsel to clarify

---

[11]It appears that defense counsel was under the impression that the government was planning to call Dittfurth and didn't learn that they were not planning on doing so until the first day of trial.

whether she intended to call White, to which she responded, "Absolutely not, Judge."

The issue lies in our review of the record. On one hand, it seems as though the district court never actually precluded 404(b) evidence related to Dittfurth. Rather, the district court expressed some skepticism as to whether the evidence could come in, but left it to defense counsel to provide the court with legal authority to do so. At the end of the first day of trial, the parties informed the court that Dittfurth was not being called to testify, and the court invited defense counsel to provide a basis for introducing the evidence. However, defense counsel never accepted the district court's offer. Instead, rather than realizing that the district court was open to the possibility of allowing the evidence as long as it had some legal basis to do so, counsel withdrew her motion. Defense counsel therefore neglected to argue to the district court that Dittfurth's presence at trial was not a prerequisite to introducing the evidence—the argument Wright advances to us on appeal. Thus, the evidence was not introduced solely because defense counsel failed to provide the court with a reason for allowing it, not because the district court excluded it.

Alternatively, it may be said that the district court ruled that the evidence was not admissible unless Dittfurth testified. One interpretation of the record is that the district court told defense counsel that it was not going to allow the evidence to come in since Dittfurth was not testifying—unless defense counsel could prove to the district court that such a ruling was erroneous. The best support for this view is the district court's January 22 minute entry, which again provided: "Further 404B on Shawn Dittfurth; *if he testifies*, the Court finds evidence regarding testing out of computer class, and his statement to have defendant Wright turn over power of attorney to property in Mexico relevant." Thus, the district court conditioned the evidence's admissibility on Dittfurth testifying. Although it had been decided by that point that Dittfurth was not going to testify, defense counsel indicated in her opening

statement that she intended to introduce the evidence. The government then objected to its introduction at the conclusion of the first day of trial, and the district court agreed that defense counsel would not be permitted to introduce the evidence absent Dittfurth testifying.

The issue is confounded by the fact that some of our prior cases suggest that a lawyer's failure to state the grounds for the admissibility of evidence, and the district court's subsequent failure to rule based on those grounds, precludes us from considering the issue. *See United States v. Tafollo-Cardenas*, 897 F.2d 976, 980 (9th Cir. 1990) (declining to consider whether defendant's statements were admissible under the general hearsay exception where the prosecutor did not raise the exception until introducing its amended jury instructions and the district court made no finding on its applicability). Other case law suggests that "[a]bsent a . . . definitive ruling by the district court that the evidence is admissible, a party does not preserve the issue of admissibility for appeal absent a contemporaneous objection," such that this court's review is only "to prevent a manifest injustice." *United States v. Archdale*, 229 F.3d 861, 864-65 (9th Cir. 2000).

We need not resolve whether the district court actually precluded the 404(b) evidence. Under any reading of the record, Wright never argued that the testimony should come in regardless of whether Dittfurth testified—the issue now presented on appeal. Thus, our review is for plain error. *See United States v. Chang*, 207 F.3d 1169, 1176 (9th Cir. 2000) (reviewing for plain error where the "theory of admissibility was not apparent from the context of [the defendant's] testimony"); *United States v. Sims*, 617 F.2d 1371, 1377 (9th Cir. 1980) ("The presentation of additional evidentiary theories on appeal is inconsistent 'with the salutary purpose of the timeliness requirement to allow the trial judge to make an informed ruling based on the issues as framed by the parties before the evidence is . . . excluded.' " (ellipsis in original) (quoting

*United States v. Lara-Hernandez*, 588 F.2d 272, 274 (9th Cir. 1978))).

The exclusion of the Dittfurth-related 404(b) evidence in this case did not amount to plain error. For there to be plain error, Wright must demonstrate that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (internal quotation marks and brackets omitted).

**[15]** First, assuming without deciding that the district court actually precluded the introduction of the 404(b) evidence because Dittfurth did not testify, it was error to do so. The government concedes that Rule 404(b) applies to non-witnesses, under our decision in *United States v. McCourt*, 925 F.2d 1229 (9th Cir. 1991). *See also United States v. Cruz-Garcia*, 344 F.3d 951, 955 n.3 (9th Cir. 2003). However, it argues that the district court should be affirmed on other grounds—namely that the proffered evidence was forbidden propensity evidence. The only case the government cites for its propensity argument is a Nebraska Court of Appeals case agreeing with *McCourt* that 404(b) permits introduction by the accused of a third-party's prior acts, but holding that there the evidence was properly excluded based on propensity grounds. *See State v. Gardner*, 498 N.W.2d 605, 609-10 (1993). In *Gardner*, the defendant was convicted of sexual assault of a child and sought to introduce evidence that since the victim's father had molested a child once before, he was the guilty party. *Id.* at 610. This is classic propensity evidence.

By contrast, Wright was not seeking to introduce evidence that Dittfurth had committed prior acts involving child por-

nography images. Rather, Wright wanted to establish that Dittfurth had the kind of computer knowledge necessary to obtain child pornography (through introduction of the Saint Mary's college records), that Dittfurth *knew* that Wright's computer contained illegal images—an element of Counts 2 and 3—(through testimony that following the FBI's search Dittfurth encouraged Wright to sign over power of attorney to Dittfurth and told Wright to flee the country), and that Dittfurth had intent to commit the crimes alleged (through testimony that he was sexually interested in underage boys). *Cf. United States v. Kapordelis*, 569 F.3d 1291, 1313 (11th Cir. 2009) ("Evidence that Defendant traveled abroad in order to engage in sexual trysts with underage boys in Prague was, thus, admissible under 404(b) as 'proof of . . . knowledge, identity, or absence of mistake or accident' and intent with regard to his travel with his cousin and his former patient during which sexually explicit images of the boys were created and with regard to his collection of pornographic images of children." (ellipsis in original)); *United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006) ("Prior instances of sexual misconduct with a child victim may establish a defendant's sexual interest in children and thereby serve as evidence of the defendant's motive to commit a charged offense involving the sexual exploitation of children.").

Moreover, "the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword." *United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984) (discussed with approval in *McCourt*, 925 F.2d at 1234, explaining that "*Aboumoussallem* is exemplary of a number of cases in which courts have admitted similar acts evidence for defense purposes").[12]

---

[12]The government also argues that the Dittfurth-related testimony is subject to a more stringent standard for third-party culpability evidence under *Guam v. Ignacio*, 10 F.3d 608 (9th Cir. 1993). In *Guam*, we held that "[e]vidence of third-party culpability is not admissible if it simply

However, though we find error, we are not convinced that any such error prejudiced Wright under the plain error standard. Wright's principal defense was that Dittfurth was responsible for possession of the child pornography images. Practically all of the defense's case was directed at explaining ways in which Dittfurth could have been the responsible party. For example, the defense argued that Wright's desktop computer and the laptop computer Wright purchased for Dittfurth to use were networked; that there was an icon on Wright's desktop for a program called "pcAnywhere," which allows one computer to access another; that one of the files charged in Count 3 was modified while Wright was at a business trade show (inferring it had to be Dittfurth who viewed the image); that Dittfurth was often alone in the apartment; and that the seven CDs containing child pornography found in Wright's briefcase were placed there by Dittfurth. Wright's 404(b) evidence would have shown that Dittfurth was computer proficient, had a history of making passes at adolescent boys, and told Wright to flee to Mexico following the search (which Wright argued indicated that Dittfurth knew there was contraband on the computer).

**[16]** Thus, even without the 404(b) evidence, the defense presented the jury with a significant amount of evidence that

affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." *Id.* at 615 (internal quotation marks and emphasis omitted). *Guam* relies on *Perry v. Rushen*, 713 F.2d 1447 (9th Cir. 1983), a habeas case addressing a defendant's constitutional claim that he was deprived of the right to a fair trial. Neither *Guam* nor *Perry* involve the exclusion of 404(b) evidence. While Wright makes a brief mention of his "constitutional right to present a complete defense and receive a fair trial," his argument clearly revolves around the district court's improper interpretation of Fed. R. Evid. 404(b). This court recently explained that, unlike a defendant's constitutional claims that he was deprived of the right to present a defense, "the substantive standard is more forgiving where the evidence was erroneously excluded on purely evidentiary principles." *United States v. Stever*, 603 F.3d 747, 755 n.3, 756 (9th Cir. 2010). Thus, *Guam* does not control here.

Dittfurth was the culpable party. Indeed, it seems like the jury shifted at least some of the blame to Dittfurth because it acquitted Wright of the possession charges with respect to the CDs. Of the additional testimony Wright did not present, only the evidence concerning Dittfurth's penchant for adolescent boys had even the potential to affect the jury's verdict; the jury knew that Wright ran several online business, and therefore had significant computer knowledge himself, and that Dittfurth told Wright to flee to Mexico is weak evidence of Dittfurth's knowledge of contraband. Considering all the evidence the jury knew about Wright and Dittfurth, excluding this additional testimony did not amount to plain error. *See United States v. Vallejo*, 237 F.3d 1008, 1023-24 (9th Cir. 2001) (finding exclusion of third-party culpability evidence not harmless where defendant was not permitted to provide an answer to the question of who committed the crime, if not the defendant); *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (same). Wright put on the "Dittfurth did it" defense. He presented the jury with myriad ways in which Dittfurth could have been responsible for the offense. Any additional evidence concerning Dittfurth would have been merely cumulative.

## B.  Prosecutorial Misconduct

Wright calls out a number of comments made by the prosecutor, either during cross-examination or in his closing argument, that he argues constitute prosecutorial misconduct and warrant reversal. To obtain a reversal based on prosecutorial misconduct, Wright must establish both misconduct and prejudice. *See United States v. Sarkisian*, 197 F.3d 966, 988 (9th Cir. 1999). "Where defense counsel objects at trial to acts of alleged prosecutorial misconduct, we review for harmless error on defendant's appeal; absent such an objection, we review under the more deferential plain error standard." *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994).[13]

---

[13]While Wright did not object to all of the allegedly improper statements in this case, he objected to those comments we find most troubling. Our prejudice inquiry is therefore guided by harmless error review.

First, Wright argues that the prosecutor improperly inserted his personal disbelief of the defense and submitted his own testimony to the jury. Wright contends that the prosecutor's statements constitute impermissible vouching.

**[17]** "The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witnesses is firmly established." *United States v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985); *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his individual impressions of the evidence."). "Improper vouching occurs when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity." *Id.* (brackets and internal quotation marks omitted). Improper vouching also occurs where the prosecutor suggests that the testimony of government witnesses is supported by information outside that presented to the jury. *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005). "We also have identified improper vouching and related misconduct in a broader range of circumstances. A prosecutor may not, for instance, express an opinion of the defendant's guilt, denigrate the defense as a sham, implicitly vouch for a witness's credibility, or vouch for his or her own credibility." *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002) (internal citations omitted). However, "vouching typically involves the prosecution bolstering the testimony of its *own* witness." *United States v. Nobari*, 574 F.3d 1065, 1078 (9th Cir. 2009).

Of the statements Wright identifies, we find the most troubling to be the "trifecta" comment delivered during the prosecutor's closing argument:

> Now, I've been handling these cases for a number of years and I've seen where defense — where the defense of it was my roommate has been advanced, and I've seen the defense advanced that it was some

sort of hacker or trojan or virus, something along those lines, and then I've also seen, well, somebody did something inappropriately, the interview, this, that, something along those lines.

But never have I seen the trifecta, all three in this same place. This is very — this is unbelievably remarkable that you guys got to witness this. So we're betting on Shawn Dittfurth to win, the FBI to place, and I guess some computer hacker, trojan, virus mystery man to show, but the problem is none of those things ever showed.

ER at 594. The prosecutor made several other references to his own impressions of the evidence throughout his closing argument. For example, on one such occasion the prosecutor remarked:

Of course [Wright's] denying that he said he knew he should not have child pornography on his computer. I'm not sure why he's denying that because *if somebody asked me* should you have child pornography on your server, on your computer, *I would say* of course not, but here he is saying no, no, no, we weren't — there was no child pornography and I never said anything about how I knew I shouldn't have child pornography on this computer.

ER at 581 (emphases added). Though less egregious, there are several more examples in the record. *See, e.g.*, ER at 582 ("And there's a number of places along the way where *I think* what the defendant said, not only was not supported by the evidence, but was so completely illogical it was absolutely ridiculous.") (emphasis added); *id.* at 589 ("The Dockmans said it was a sweater, but *I think* they'd remember a suede Tasmanian devil vest and distinguish that from a sweater.") (emphasis added); *id.* at 590 ("But the last one, the betrayal, the three different prongs of this betrayal that were alluded to

in the opening statement, *I found* that one most remarkable of all.") (emphasis added).[14]

**[18]** While the government responds to many of the statements Wright focuses on, it includes only a passing reference to the prosecutor's "trifecta" comment. While it is probably not correct to label this misconduct as vouching, *see Nobari*, 574 F.3d at 1078,[15] the prosecutor's comment not only gave the jury his impression of the evidence in the case, but it improperly introduced evidence outside the record—i.e., the prosecutor's experience with similar cases—as a means of commenting on the defense's case and Wright's credibility. *Cf. United States v. Galloway*, 316 F.3d 624, 632-33 (6th Cir. 2003) (statement during closing argument held to be improper

---

[14]In addition, Wright identifies a number of instances in the record in which the prosecutor referred to aspects of the defense's case as "absolutely ridiculous," ER at 586, an "absurd notion," *id.* at 591, and began questions during his cross-examination of Wright with "incredibly," *id.* at 547. We have not found remarks such as these to be improper. *See United States v. Velarde-Gomez*, 224 F.3d 1062, 1073 (9th Cir. 2000) (not misconduct to refer to defendant's testimony in closing argument as a "silly story" and "ridiculous"), *rev'd en banc on other grounds*, 269 F.3d 1023 (9th Cir. 2001) (en banc); *Williams v. Borg*, 139 F.3d 737, 744-45 (9th Cir. 1998) (no misconduct where prosecutor called the defendant "stupid" on four different occasions and referred to the defense's closing argument as "trash"); *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) (prosecutor's statement that "[i]t's unbelievable" to suggest that the government's witness lied under oath not improper, since there were "many instances of flatly contradictory testimony on important issues in the case, and it was proper for the government to argue that the jury ought not to believe the appellant's version").

[15]In the usual case of vouching, the prosecutor does not merely give his impression of the defendant's case, or highlight his own experience; rather, he explicitly assures the government witnesses' veracity. *See, e.g.*, *Kerr*, 981 F.2d at 1053 (prosecutor described the testimony of one government witness as "very candid," another as "candid," and a third as "honest"); *United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992) (assuring the jury that the government's witness "could not just get up here and say whatever he wanted to say" or he would be prosecuted for perjury) (alterations omitted).

where prosecutor told the jury about his experience trying drug cases); *McKoy*, 771 F.2d at 1211 (jury could have construed the testimony of former prosecutor, who testified as a witness at trial, "as 'expert testimony' based on his personal knowledge and his prior experience with other cases"). Though the prosecutor's statement might not technically be viewed as improper vouching, it was certainly improper, since it "denigrat[ed] the defense as a sham." *United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999); *see also Hermanek*, 289 F.3d at 1101 ("Although appellants attempt to characterize the prosecutor's argument as improper vouching, their contention is viewed more aptly as an allegation of prosecutorial misconduct for referring to facts not in evidence."). Accordingly, the prosecutor's "trifecta" comment was improper.

Similarly, the prosecutor's repeated references to how he viewed the evidence were also improper. *See id.* at 1100 ("[P]rosecutors' arguments not only must be based on facts in evidence, but should be phrased in such a manner that it is clear to the jury that the prosecutor is summarizing evidence rather than inserting personal knowledge and opinion into the case.").

Wright next contends that the prosecutor manipulated or misstated the evidence and forced Wright to imply that Agent Andrews lied on the stand. He first argues that the prosecutor forced Wright to call Andrews a "rogue agent"—in reference to the tactics she employed during Wright's interview. It is true that the prosecutor used the term "rogue agent" to refer to Agent Andrews, and Wright wound up adopting that term in response. *See* ER at 544-45. Defense counsel objected to the prosecutor's statement, and her objection was sustained. There is no indication that the prosecutor was misstating evidence. Rather, he was engaging Wright in a fairly argumentative cross-examination in order to poke holes in Wright's

version of the facts. There was nothing improper about the prosecutor's conduct in that instance.[16]

Wright also takes issue with the way in which the prosecutor pitted Wright's credibility against the government's witnesses. He relies on *United States v. Combs*, 379 F.3d 564, 573 (9th Cir. 2004), where we held it was improper to ask the defendant point blank whether the testifying agent lied, noting that the prosecutor referred several times in closing argument to the defendant calling the agent a liar. *Id.* at 567-68. In *Combs*, the prosecutor also impermissibly referenced the fact that if the jury believed the testifying agent had lied, the agent would have committed perjury, "flush[ing] his ten-year career down the toilet." *Id.* at 568.

*Combs* is distinguishable. The prosecutor did not force Wright to impugn Agent Andrews's testimony the same way the prosecutor did in *Combs*. Rather, in his closing argument, the prosecutor contrasted Wright's testimony with that of Agent Andrews and Detective Englander. Unlike in *Combs*, where the prosecutor explicitly forced the defendant to impugn the veracity of the agent's testimony, the prosecutor's argument here was not improper. *See Molina*, 934 F.2d at 1445 ("In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying."); *see also United States v. Garcia-Cuizar*, 160 F.3d 511, 520 (9th Cir. 1998) (distinguishing *Molina* on the grounds that in *Garcia-Cuizar*, the prosecutor interjected his own personal opinions about the defendant's and government witness's credibility); *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997)

---

[16]Wright points to a number of other prosecutorial lines of questioning that he contends resulted in the evidence being misstated. Upon our thorough review of the record, we do not find any of these statements to be particularly troubling. Rather, they consist mostly of argumentative questioning; indeed, the district court sustained many of defense counsel's objections on that basis.

("Criticism of defense theories and tactics is a proper subject of closing argument.").

Finally, Wright argues that the prosecutor improperly insulted him several times throughout cross-examination and in the prosecutor's closing argument. Wright points to the following examples: (1) referring to Wright's statement that he used pornography to avoid being promiscuous, the prosecutor stated "Like are those the only two options? I mean couldn't you be in a committed relationship?"; (2) the prosecutor asked Wright during cross-examination, "You're proud of your collection of child pornography, aren't you?" (Wright responded: "No, it actually disgusts me that people would trade such things."); (3) the prosecutor referred to T-shirt slogans Wright came up with for his business OffensiveTs.com; (4) the prosecutor told the jury that Wright's practice of burning blockbuster movies was illegal; and (5) the prosecutor responded to the defense's theory that law enforcement was "out to get him" by telling the jury that Wright was not Pablo Escobar or "the Larry Flynt of child pornography." Not one of these statements was improper. "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000) (holding prosecutor's statements that the defendant "had an excuse for everything" and "was trying to skirt the law—just like he tries to skirt everything else" were not improper) (internal quotation marks omitted); *United States v. Rude*, 88 F.3d 1538, 1547-48 (9th Cir. 1996) (not improper for prosecutor to refer to the defendants as "crooks," or "evil" at least eleven times, or to use other derogatory remarks such as "con man," or "trolling around for victims" over 90 times).

**[19]** Having established that at least some of the prosecutor's statements in this case were improper, Wright must also establish prejudice. The question is "whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial." *Hermanek*, 289 F.3d at 1102.

Wright has not established prejudice. The improper statements were relatively isolated incidents over the course of a ten day trial. The "trifecta" comment was by far the most egregious statement made by the prosecutor, though it too was mitigated by defense counsel's excellent rebuttal, which focused extensively on the three defenses to which the prosecutor's "trifecta" comment referred. While Wright's credibility was certainly a key issue at trial, there is no indication that the jury discredited his testimony. Rather, the jury acquitted Wright of Counts 1 and 4-10, "reinforc[ing the] conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly." *United States v. Young*, 470 U.S. 1, 18 n.15 (1985) (finding no plain error despite prosecutor's improper vouching based in part on the fact that the jury acquitted the defendant of the most serious charge he faced); *United States v. De Cruz*, 82 F.3d 856, 863-64 (9th Cir. 1996) (finding allegedly improper prosecutorial comments to be harmless where the jury acquitted defendant of one of the charges, indicating its ability to weigh the evidence without prejudice).

[20] Other than the "trifecta" comment, the prosecutor's misconduct was fairly mild and was mitigated by the court's general jury instructions, given at the beginning of trial, as well as at the end of the prosecutor's closing argument and during the final jury instructions that "[a]rguments and statements by lawyers are not evidence." *See United States v. Necoechea*, 986 F.2d 1273, 1280 (9th Cir. 1993) (general instruction sufficient to cure mild vouching). Accordingly, the prosecutor's improper statements amounted to harmless error.

## C.   Access to Mirrored Hard Drive

[21] On July 27, 2006, the Adam Walsh Child Protection and Safety Act, Pub. L. 109-248, 120 Stat. 587 (the Adam Walsh Act), was signed into law. Codified at 18 U.S.C. § 3509(m), the Adam Walsh Act altered the balance of pretrial criminal discovery under Rule 16 of the Federal Rules of

Criminal Procedure. Under Rule 16, the government must turn over to the defense material evidence obtained from the defendant that the government intends to use in its case-in-chief. Before the Act, courts had held that such material includes "mirror image" copies of computer evidence in child pornography cases. *See United States v. Hill*, 322 F. Supp. 2d 1081, 1091 (C.D. Cal. 2004) (Kozinski, J., sitting by designation). However, now under the Adam Walsh Act, "a court shall deny, in any criminal proceeding, any request by the defendant to copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child pornography . . . , *so long as the Government makes the property or material reasonably available to the defendant*." 18 U.S.C. § 3509(m)(2)(A) (emphasis added). The Act goes on to define "reasonably available" as providing the defendant "ample opportunity for inspection, viewing, and examination at a Government facility of the property or material by the defendant, his or her attorney, and any individual the defendant may seek to qualify to furnish expert testimony at trial." *Id.* § 3509(m)(2)(B).

Wright raises three arguments with respect to his access to a mirror-image copy of his computer hard drive in this case. First, he argues that the hard drive was not made "reasonably available" to him, thus violating a number of constitutional rights;[17] second, he claims that the district court erred in denying Wright a mid-trial continuance that would have allowed him an additional day to subject the hard drive to forensic testing; and third, he contends that the Federal Public Defender (FPD) and its expert are employees of "the court" under the meaning of the Act, and the FPD office is a "government facility" under the Act.

As Wright claims the violation of a number of constitu-

---

[17]Wright includes general allegations that he was denied due process, effective assistance of counsel, confrontation, and compulsory process. Wright does not bring a facial challenge to the Act's constitutionality.

tional rights based on the evidence not being made "reasonably available" to him, our review of that issue is de novo. *See United States v. Larson*, 495 F.3d 1094, 1100-01 (9th Cir. 2007) (de novo review of Confrontation Clause claims based on exclusion of an area of inquiry); *United States v. Bahamonde*, 445 F.3d 1225, 1228 n.2 (9th Cir. 2006) (de novo review of denial of due process and compulsory process claims). We review the district court's denial of a continuance for abuse of discretion. *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1138 (9th Cir. 2005). We review de novo questions of the Adam Walsh Act's construction. *United States v. Kaczynski*, 551 F.3d 1120, 1123 (9th Cir. 2009).

    *1.    Was the evidence made "reasonably available" to Wright?*

    On November 14, 2006, the parties entered into a stipulation and protective order outlining Wright's access to a "bit-by-bit image copy" of Wright's hard drive. The stipulation provided for the evidence to "remain in the care, custody and control of the United States Attorney's Office." Defense counsel and the defense expert, Rick Lavaty, were permitted to access the evidence; the stipulation provided that they would be "buzzed in during regular office hours" to the U.S. Attorney's Office and that when it was not being analyzed, the hard drive was to remain in a secure location. The U.S. Attorney's Office established a "secure space" for the defense expert to set up his own equipment and conduct the examination. If it was necessary, the expert was permitted to leave his computer and the hard drive running overnight. At the conclusion of each session, the hard drive was to be returned to an authorized employee at the office where it would be placed back in a secure location. The government agreed not to "look at any material the defense team may leave in the secure space, including, but not limited to, exhibits and documents, nor . . . perform any forensic analysis of the bit-by-bit hard drive provided to the defense team." If the computer was left running overnight, the government promised to "make reason-

able attempts to be sure no one uses the offered secure space in the defense expert's absence."

After the parties entered into the stipulation, Lavaty assembled a "computer forensics cart" to take over to the U.S. Attorney's Office for his examinations. On November 27, 2006, defense counsel told the district court that Lavaty felt "comfortable" with the stipulation and protective order and planned on commencing his examination. Counsel estimated that Lavaty needed approximately 150 hours for the full forensics exam and to create all the exhibits necessary for trial.

The defense was permitted to access the evidence for fourteen months—that is, from November 14, 2006 (the date of the stipulation), to the start of the trial on January 17, 2008. Over the course of that time, defense counsel raised various budget, timing, and staffing problems that counsel maintained were preventing the defense from adequately examining the hard drive. On January 4, 2008, less than two weeks before trial (which had been adjourned numerous times up to that point), Wright moved to continue trial based on Lavaty's inability to finish his examination, citing Lavaty's other obligations with the FPD office. Counsel also noted that her own schedule and work demands had prevented her from concentrating fully on the case. The district court denied the continuance. Wright renewed the motion one week later, on January 11, 2008, but it was denied again.

Wright argues that the evidence was not made reasonably available to him because the district court failed to recognize the defense office's budget and staffing problems, Lavaty's other duties with the FPD office, and the court's earlier denial of Wright's request for an outside expert, which was denied because it was deemed too costly.

**[22]** Interpretation of the Adam Walsh Act is an issue of first impression in this circuit; indeed, the Seventh Circuit is

the only Court of Appeals yet to consider the Act. *See United States v. Shrake*, 515 F.3d 743 (7th Cir. 2008) (rejecting a facial challenge to the Act's constitutionality). There are a number of district court cases considering whether defendants were given "ample opportunity for inspection, viewing, and examination at a Government facility" of child pornography material, yet none of those cases is particularly helpful to Wright.

Wright principally relies on *United States v. Knellinger*, 471 F. Supp. 2d 640 (E.D. Va. 2007). There, the district court concluded that the defendant had not been given an ample opportunity to conduct an examination of the evidence and thus ordered the government to turn over to the defendant a copy of the hard drive. *Id.* at 650. In *Knellinger*, the defendant intended to pursue the theory that the child pornography he was charged with possessing was not produced using real minors. *Id.* at 647; *see Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). The defendant's expert witnesses, who would have to be privately retained, testified that they would not agree to work on the case if they could only perform their examination at a government facility. *Knellinger*, 471 F. Supp. 2d at 647-48. One expert testified that while he normally charged approximately $135,000 for his services in a child pornography case, he would charge approximately $540,000, excluding moving expenses, in a case in which he had to analyze the material away from his office. *Id.* at 647. He also testified that even if he were to perform his examination at a government facility, "he wouldn't be able to service the client or the attorney effectively." *Id.* (internal quotation marks omitted). As a result, he would not agree to work on a case like Knellinger's. Similarly, another expert testified that he would not work on the case "because of the difficulty associated with moving equipment to, and adequately performing his analytical work in, a Government facility." *Id.* at 648. Therefore, the terms of the Adam Walsh Act effectively precluded the defendant from pursuing his only viable defense.

*Knellinger* is easily distinguishable. Unlike in *Knellinger*, Wright's forensic expert, Lavaty, claimed he was "comfortable" with the parties' terms for providing Wright access to the hard drive. Wright was afforded fourteen months to conduct his examination and does not claim that the agreed upon terms entered into by the parties precluded Wright from pursuing a viable defense theory. Rather, Wright bases much of his argument on the fact that prior to the Adam Walsh Act being passed into law, the district court found that the government's proposed terms of access "would hamper defendant's preparation of this case," and thus ordered the government to provide Wright a mirror copy of the hard drive.[18] However, that ruling bears little, if any, relevance to whether the government's proposed terms provided Wright with "ample opportunity" to examine the evidence.

**[23]** Wright's argument essentially boils down to the following contention: the Adam Walsh Act requires that the defendant and the government have *equal access* to the child pornography evidence. Yet this is not what the Act provides. It provides only that the defendant be given "ample opportunity" to examine the evidence. In any event, none of the cases that Wright cites is apposite. For example, in *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984), we held that the government is required to identify witnesses to the crime whose testimony may be exculpatory. It was in that context that we observed that "[b]oth sides have an equal right, and should have an equal opportunity, to interview [such witnesses]." *Id.* (internal quotation marks omitted).

Nor does the Seventh Circuit's decision in *Shrake* help Wright. In *Shrake*, after rejecting the defendant's facial challenge to § 3509(m), the court expressed its concern over the fact that the prosecution provided its own private expert consultant an exact copy of the hard drive, but denied the defense

---

[18]After the Adam Walsh Act became law, the district court granted the government's motion for reconsideration and reversed its prior order.

the same. 515 F.3d at 746. The court stated that rather than asking the district court to foreclose testimony by the prosecution's expert, which the district court denied doing, "[t]he appropriate relief—which defense counsel never sought— would have been access on equal terms." *Id.* at 747. *Shrake* had no occasion to define what it meant by "access on equal terms." However, by "access," the court appears to have been referring to the types of forensic tools each side had available to it in performing its examination. Indeed, the court noted that "Shrake's counsel did not seek access on equal terms, perhaps because the prosecution's expert did not use any forensic tool that was unavailable to the defense expert when he examined the hard drive." *Id.* Thus, any defense request for "access on equal terms" would have been pointless. In any event, *Shrake* clearly does not hold that the defendant and the government must be given an equal amount of time to examine the evidence, which is Wright's main contention.

**[24]** We need not define the exact parameters of what it means to give a defendant "ample opportunity" to examine child-pornography evidence. Wright was permitted to access the hard drive for a period of fourteen months in a secure location within the U.S. Attorney's Office. Wright makes no claim that the parties' arrangement threatened to disrupt the attorney-client relationship or that the defense team's work product was compromised in any way. In short, Wright was given "ample opportunity for inspection, viewing, and examination" under the Act. *See United States v. Cordy*, 560 F.3d 808, 816 (8th Cir. 2009) (in a case governed by the Adam Walsh Act, defense counsel had adequate time for trial preparation based on having access to the computer data for three months).

> 2. *Did the district court err in denying Wright's motion for a mid-trial continuance?*

Next, Wright argues that the district court improperly denied his request for a one-day mid-trial continuance so that

Lavaty could conduct further forensic testing. Wright claims that the testing was necessary to rebut the government's argument that the mIRC file server was installed long before 2002 (when Dittfurth moved in with Wright). Practically, this weakened Wright's defense—that Dittfurth was the person responsible for the child pornography.

According to the government, Wright installed the mIRC program on his computer in November 2000. On Day 7 of the trial, during voir dire, the prosecutor asked Lavaty his opinion about when Wright installed the mIRC program on his computer. The prosecutor tried to establish that the program was installed in 2000, not 2002 as Lavaty had testified. The prosecutor's theory was that the 2002 creation date for the mIRC files—which Lavaty testified showed that Wright installed the program in 2002—was due to the installation of a newer version of the mIRC program, thus replacing the older 2000 version. Lavaty admitted that this was a possible explanation, but also offered reasons for discounting such a theory. After the prosecutor asked, "Did you test that?" Lavaty conceded that he had not.

Wright argues that the government's theory—that the mIRC program had been installed in 2000—was not disclosed to the defense until just five days before the start of trial. When Lavaty admitted on the stand that he had not tested for the reasons he gave for a 2002 installation date, Wright asked for a one-day continuance so that Lavaty could conduct the requisite tests. The court denied the request. Wright argues that the district court abused its discretion in denying Wright's request for a continuance. We disagree.

First, on January 11, six days before the start of trial, Wright moved for a continuance because the government had apparently just disclosed (five days prior) an expert report alleging that the mIRC and file-server programs were installed in 2000. Wright told the district court that the continuance was necessary because the government's newly dis-

closed evidence "relates specifically to Count 1 of the indictment which is the ten-year mandatory minimum count in the report of the forensic examination which was done just this last Tuesday by their file server expert who is the guy who wrote the program." The jury acquitted Wright of Count 1. Therefore, to the extent that the continuance would have allowed Wright to better prepare his defense as to Count 1, he has not established prejudice. *See Rivera-Guerrero*, 426 F.3d at 1139 (holding that the defendant must establish prejudice from the denial of a continuance).

However, it is not entirely clear that the government's theory about the 2000 installation date related *only* to Count 1. To the extent it related to the other alleged counts, Wright was given a total of eleven days (seven business days) prior to the start of trial to rebut the government's evidence. This was more than enough time. *See United States v. Barrett*, 703 F.2d 1076, 1081 (9th Cir. 1983) ("[F]airness requires that adequate notice be given the defense to check the findings and conclusions of the government's experts." (quoting *United States v. Kelly*, 405 F.2d 26, 29 (2d Cir. 1969) (internal quotation marks omitted))).

Moreover, despite Lavaty's concession that he did not test for the 2002 theory, he provided persuasive support during his testimony even in the absence of testing. When the prosecutor concluded his voir dire, defense counsel established on direct examination that Lavaty's 2002 theory was certainly possible. Indeed, Lavaty testified that it was his "belief" that the mIRC program was installed on Wright's computer in December 2002. *Cf. Rivera-Guerrero*, 426 F.3d at 1138 (denial of the continuance "resulted in the defendant's inability to present *any evidence* that might rebut the government's medical assertions" (emphasis added)).

**[25]** As we held above, Wright was given "ample opportunity" to prepare his defense. Yet even without considering the fourteen months the defense team had to conduct forensic

testing, it had over a week to prepare expert testimony in response to the government's theory that Wright installed the file-server software in 2000. Therefore, the district court did not abuse its discretion in denying Wright's motion for a one-day mid-trial continuance.

   *3.  Are the FPD office and its expert employees of "the court" or is the FPD office a "government facility" under the Act?*

**[26]** Finally, Wright briefly argues that FPD counsel and its expert are under the judiciary, and thus employees of "the court," *see* 18 U.S.C. § 3509(m) (requiring child pornography to "remain in the care, custody, and control of either the Government or the court"), and that the FPD office is a "government facility," *see id.* (providing for inspection of the contraband at a "Government facility"). Therefore, Wright maintains, defense counsel was entitled to a mirrored copy of the hard drive. Both arguments are contrary to the statute's language and structure, which differentiate between the Government, the court, and the members of the defense team (including the "defendant, his or her attorney, and any individual the defendant may seek to qualify to furnish expert testimony at trial"). In any event, the government did provide the defense team "ample opportunity" to examine the hard drive at a "Government facility"—the U.S. Attorney's Office. Even assuming the FPD office is a "Government facility," the statute does not require the government to provide the defendant access at multiple facilities.

## D.  Jury Instruction

Wright's final argument that he was denied a fair trial challenges the jury instructions on Counts 3 through 10. "We review de novo whether the jury instructions accurately define the elements of a statutory offense." *United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001). Wright raises two issues; neither of which we find persuasive.

First, he argues that the court's instructions did not require the jury to find that Wright knew the images that were specifically charged in the indictment were on his computer or that they contained child pornography. We disagree. The jury was instructed to find whether: (1) "the defendant knowingly possessed . . . a . . . desktop computer and hard disk . . . containing a visual depiction of a minor engaged in sexual explicit conduct"; (2) "the defendant knew that the computer and computer disks . . . contain[ed] a visual depiction of a minor engaged in sexually explicit conduct"; and (3) "the defendant knew that the visual depiction contained in the computer . . . and hard disk . . . contained visual depiction of a minor engaged in sexually explicit conduct." The jury was also told that "[i]n this case the parties have stipulated that the images are of child pornography." Thus there is no question that the jury was asked whether Wright knew that the files charged in the indictment—those stipulated to by the parties—were on his computer or contained child pornography.

**[27]** Second, Wright contests the court's definition of "possession." Again, in order to convict Wright of Counts 3 through 10, the jury had to find that Wright "knowingly possessed . . . a . . . desktop computer . . . containing a visual depiction of a minor engaged in sexual explicit conduct." Wright argues that in defining the term "possession," it was error for the court to instruct simply that "[p]ossession as it pertains to computer images can include proof that the defendant had control over the images," because such control would be possible even if Wright did not know whether the images were on his computer. However, in the paragraph immediately preceding that instruction, the court told the jury that "[a] person has possession of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it. More than one person can be in possession of something if each knows of its presence and has the power and intention to control it." The district court clearly instructed the jury that

Wright had to know the images were on his computer in order to possess them.

### E.   Cumulative Error

Wright also argues that even if each alleged error did not rise to reversible error, reversal is required due to their cumulative effect on his trial.

"Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal." *United States v. Inzunza*, 580 F.3d 894, 911 (9th Cir. 2009). An important factor in considering the cumulative effect of errors is the strength of the prosecution's case. *See Nobari*, 574 F.3d at 1082.

We have identified two potential forms of error in this case: the exclusion of 404(b) evidence and the prosecutor's improper statements. Neither error, on its own, requires reversal. However, we recognize that much of the prosecution's case was based on Wright's statements to Agent Andrews and Detective Englander. Because we are remanding to the district court for fact-finding on Wright's motion to suppress those statements, we do not address Wright's claim of cumulative error at this stage of the proceedings. *See United States v. Blanco*, 392 F.3d 382, 397 (9th Cir. 2004) (declining to consider question of cumulative error in light of remand to the district court for further fact-finding).[19]

### CONCLUSION

For the foregoing reasons, we REVERSE Wright's Count

---

[19]Nor do we address Wright's sentencing arguments at this time. Even if we were to affirm Wright's Count 3 conviction on review of the district court's fact-finding, the district court should "begin the sentencing process afresh" in light of our reversal of Wright's Count 2 conviction. *United States v. Handa*, 122 F.3d 690, 692 (9th Cir. 1997).

2 conviction under 18 U.S.C. § 2252A(a)(1). We REVERSE the denial of Wright's motion to suppress his statements to Agent Andrews and Detective Englander, and REMAND with instructions to the district court to make essential factual findings explaining the basis for its decision. We AFFIRM as to Wright's other claims of error, though decline to consider his claim of cumulative error and his challenges to his sentence until the district court has found those facts essential to our review of the suppression issue and resentenced Wright. This panel retains jurisdiction over all future appeals in this case.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

HUG, Circuit Judge, concurring in part:

As I see this case Wright was charged with offenses in ten counts. He was acquitted on all counts except Count 2 and Count 3, which are the subject of this appeal. Count 2 charged Wright with shipping child pornography by computer in interstate commerce in violation of 18 U.S.C. § 2251(c)(1)(A), (c)(2)(A) and (d). Count 3 charged Wright with possession of child pornography on a computer hard drive. Both counts require for federal jurisdiction the requirements of 18 U.S.C. § 2252(a)(1) that the child pornography be knowingly mailed, transported or shipped in interstate or foreign commerce.

The majority opinion holds that this requirement is not met for Count 2 but is met for Count 3. Thus the remainder of the opinion concerns only Count 3 — the possession count. I agree with the interstate commerce rulings and I also agree with the majority opinion's discussion of all of the remaining issues regarding Count 3 except the necessity to remand for additional findings on the suppression issue.

The ruling of the district court was terse and the judge did not make specific findings. The court stated, "after hearing

the evidence and reviewing the memorandum filed by counsel, the Court will deny the motion to suppress the statements." I agree with the Government's brief, pages 53-58, that the error was not "plain" and further, it was not error because the ruling permitted appellate review of the legal questions involved even though detailed findings were not made. This was a case where the statements of the government agents and Wright's statements were diametrically opposed. It was simply a matter of credibility and the district court obviously believed the government agents as to what happened — Wright was not in handcuffs, he was given a *Miranda* warning, and he did not make an unambiguous request for a lawyer. Wright even later admitted at trial his statements were voluntary. It is obvious what the district court found and it would simply be mechanical to detail it. I would prefer we simply affirm that conviction and the 60 month sentence.